Filed 6/28/23  In re Jayden L. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JAYDEN L. et al., Persons Coming Under the Juvenile Court Law. | B318377, B320289, B323551 (Los Angeles County Super. Ct. No. 19CCJP00851A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>VIOLETA L. et al.,<br><br>        Defendants and Appellants. | |

        APPEAL from orders of the Superior Court of Los Angeles County, Debra R. Archuleta, Judge.  Conditionally reversed with directions.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant Violeta L.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant Danny A.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Violeta L. (mother) has filed three separate appeals involving her four children.[1]  We address all three appeals in this combined opinion.

Mother's first appeal (appeal No. B320289) involves only her older two children, Jayden L. (born October 2010) and Brianna M. (born August 2016).  She appeals from an order of the juvenile court terminating her parental rights  pursuant to Welfare and Institutions Code section 366.26.[2]  Mother argues that the juvenile court abused its discretion by denying her request for a contested hearing in order to present evidence supporting the beneficial parental relationship exception to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(i).  Mother further contends that the matter must be remanded for a proper inquiry under the Indian Child

---

[1]  None of the children's fathers are parties to appeal No. B320289 or appeal No. B318377.  The father of the youngest two children, Danny A., is a party to appeal No. B323551.

[2]  All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). We find no error in the court's denial of a contested hearing, but by agreement of the parties, we conditionally reverse and remand the matter for further inquiry under ICWA.[3]

Mother's second appeal (appeal No. B318377) involves all four children, Jayden, Brianna, Prince A. (born Feb. 2019), and Liani A. (born Nov. 2019). Mother challenges the trial court's orders summarily denying two petitions that she filed pursuant to section 388. We find no error in the juvenile court's summary denial of the orders.

Mother's and Danny's third appeal (appeal No. B323551) is from an order terminating their parental rights to the two younger children, Prince and Liani. Mother argues that the juvenile court erred in finding that the beneficial parental relationship exception to termination of parental rights set forth in section 366.26, subdivision (c)(1)(B)(i) did not apply. We find no error in the juvenile court's decision.

Although we find no error, based upon the agreement of the parties, we conditionally reverse and remand the matter for further inquiry as to all four children under ICWA.

### COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**Referral, petition and detention**

Jayden and Brianna came to the attention of the Los Angeles County Department of Children and Family Services

---

[3] All three appeals raise the issue of ICWA error. Our conditional affirmance and remand applies to all four children, therefore we only address this issue once.

(DCFS) in February 2019 at the time of the birth of their half-sibling, Prince, when mother tested positive for methamphetamine. Mother denied methamphetamine use and claimed she must have tested positive for the drug due to close interaction with Prince's father, Danny. Mother was discharged from the hospital and did not return to visit Prince, who remained on a hospital hold.[4]

Mother and the children lived with maternal grandmother, Ana L. (maternal grandmother). The social worker interviewed mother, Danny, and maternal grandmother. All family members acknowledged that both mother and Danny used methamphetamine. Mother reported that Brianna's father was not a part of Brianna's life, and Jayden's father was incarcerated at an unknown location.

Mother later admitted to using drugs while pregnant. Jayden said mother had disclosed her drug use to him but claimed she stopped. Jayden witnessed Danny smoking "something that looked like a brown cigarette."

Mother described an incident during which Danny got frustrated with Jayden and locked him out of the apartment. During another incident, Danny, who was angry about an argument, drove through two red lights while the children were in the car.

On February 7, 2019, DCFS filed a petition on behalf of the children pursuant to section 300, subdivision (b)(1), alleging mother had an unresolved history of substance abuse and was a

---

[4]     Danny is not the father of Jayden or Brianna. Jayden's father, Arthur M., was incarcerated throughout the proceedings. Brianna's father, Alexander M., died during the proceedings.

4

recent abuser of amphetamine and methamphetamine, rendering her incapable of providing regular care for the children. Mother used illicit drugs during her pregnancy with Prince and had two positive toxicology screens. Mother was also under the influence of illicit drugs while the children were under her care and supervision. Thus, there was a substantial risk the children would suffer serious physical harm or illness as a result of mother's substance abuse. The petition further alleged Danny had a history of substance abuse and was a current abuser of methamphetamine.

At the February 8, 2019 initial court appearance, mother denied the allegations in the petition. The court found a prima facie showing had been established and ordered the children detained. The court found Danny to be the presumed father of Prince.

On March 21, 2019, DCFS filed an amended petition, adding the allegation that Brianna's father failed to provide her with the necessities of life.

At the jurisdictional/dispositional hearing on March 22, 2019, the juvenile court sustained the allegations in the petition as amended, found the children were minors described by section 300, subdivision (b)(1), declared them dependents of the juvenile court, removed them from the custody of the parents pursuant to section 361, subdivision (c)(1), and ordered the children placed in suitable placement under the supervision of DCFS. The court ordered monitored visitation for mother, Danny, and Alexander (Brianna's father) and ordered DCFS to provide reunification services for them. The reunification program for mother included a full drug treatment program, random drug testing, a 12-step program, and individual counseling to address case issues,

including parenting.  The reunification plan for Danny required him to participate in a six-month drug and alcohol program with after care, a 12-step program, random drug testing, and individual counseling to address case issues including anger management and parenting.

## Proceedings relevant to ICWA

On February 2, 2019, mother stated she had no Native American ancestry.  On February 8, 2019, mother completed Judicial Council form ICWA-020, confirming she had no Indian ancestry as far as she knew.  On the same date, Alexander completed form ICWA-020, stating he had no Indian ancestry as far as he knew, and Danny also indicated that he had no Indian ancestry.

At the February 8, 2019 court appearance, mother reported she had no reason to know that Arthur (Jayden's father) had any Native American ancestry.  The court found there was no reason to know that the case was governed by ICWA.

On February 27, 2019, mother and Alexander again denied any knowledge of Native American ancestry.  On February 28, 2019, Danny submitted form ICWA-020 indicating he had no Indian ancestry to his knowledge.

There is no record of any extended family members of any of the children being asked about Indian ancestry.

## Reunification

DCFS reported the children felt safe with their caregivers, who were meeting all their needs.  Mother was meeting with the children once a week for four hours.  The children were happy and comfortable with mother, but Jayden after some visits appeared upset.  Several times after visits Jayden reported to have been instructed by mother to say he wanted to see Danny.

Mother would also focus on Danny in phone and FaceTime conversations, asking Jayden if he wanted to speak with him. During an April 7, 2019 visit, an argument between mother and maternal grandmother occurred, and mother then paid more attention to Danny than to the children. On May 4, 2019, the visit was terminated because mother arrived with Danny. On June 25, 2019, the visitation monitor reported visits between mother and the children had not been positive because mother was on her phone, rather than focusing on the children. Mother also discussed her problems with the children, such as domestic violence between her and maternal grandmother.

Mother claimed to love Danny and wanted him to have a relationship with Jayden and Brianna. Mother acknowledged Danny could be aggressive but noted he was using methamphetamine less frequently. Mother admitted having used methamphetamine on four occasions but claimed not to be supervising her children when she had done so.

At the September 20, 2019 six-month review hearing, the court found that return of Prince to the custody of Danny would create a substantial risk of detriment to Prince's physical and emotional wellbeing and that Danny had not made substantial progress in his case plan. Danny had participated in services, but he missed sessions and drug tests, tested positive for methamphetamine multiple times and admitted he relapsed. Nevertheless, the juvenile court ordered DCFS to continue to provide services for Danny

Mother reported she continued to live with Danny, but was planning on moving out of the home. Maternal grandmother reported that Danny was physically aggressive by throwing a fan at mother. This was not the first time maternal grandmother

had reported conflicts between mother and Danny. Maternal grandmother was instructed to call police should such events occur in the future. At the continued October 25, 2019 six-month review hearing, the juvenile court found mother had not made substantial progress and that returning the children to the custody of the parents would create a substantial risk of detriment to their physical and emotional well-being. The court ordered services to continue for mother.[5]

**Birth and detention of Liani**

Liani was born in November 2019. Efforts were made to prevent detention of the child; however, mother was still living with Danny despite his continued drug use and abusive behaviors. On December 9, 2019, DCFS sought and obtained a protective custody warrant for Liani.

On December 12, 2019, DCFS filed a petition on behalf of Liani pursuant to section 300, subdivision (b)(1). The petition was associated with the related case involving Jayden, Brianna and Prince. The petition alleged that mother and Danny had a history of substance abuse, Danny was a current user of amphetamine and methamphetamine, and that Jayden, Brianna, and Prince were current dependents of the juvenile court.

Mother appeared at the December 13, 2019 detention hearing. The court found that DCFS had made a prima facie showing that Liani was a minor described by section 300 and ordered her detained. The court found Danny to be Liani's presumed father. The juvenile court noted that both mother and

---

[5] During the first reunification period, from March to October 2019, Prince remained placed with the paternal grandmother until he was placed in a foster home on August 22, 2019.

8

Danny had denied Indian ancestry and found ICWA did not apply.

Danny was ordered to stay 100 yards away from mother's residence. The court ordered supervised visitation for the parents, who were to visit Liani separately.

In the jurisdiction/disposition report as to Liani, DCFS reported that Danny had a significant criminal history: in 2004 he was convicted of voluntary manslaughter and sentenced to 17 years in prison; in 2017 he was arrested for possession of a controlled substance in jail; and in 2019 he was charged with hit and run: death or injury. According to a last minute information for the court dated February 6, 2020, Danny claimed he and mother were no longer in a relationship, but he planned to reunite with her. DCFS commended mother for the progress she had made in completing her programs, but there were concerns regarding mother's protective capacity, as she did not leave Danny until there was a stay away order, despite his substance abuse and domestic violence in the home. Danny had continued to test positive for methamphetamine. Given mother's progress, DCFS had liberalized mother's visits with Liani to unsupervised.

At the February 21, 2020 jurisdiction hearing, the court sustained the allegations of the first amended petition as to Liani, finding she was a minor described by section 300, subdivisions (b)(1) and (j).

At the July 15, 2020 disposition hearing for Liani, the court declared Liani a dependent of the juvenile court, removed her from the custody of the parents pursuant to section 361, subdivision (c)(1), and ordered Liani placed in suitable placement under the supervision of DCFS. The court ordered reunification services and monitored visitation for both parents, but permitted

mother unmonitored visitation after completing 10 consecutive drug tests.

**Continued reunification**

Danny continued to test positive for amphetamine and methamphetamine and to display aggressive behavior. According to a status report on March 23, 2020, mother was having unmonitored visits with Prince, which included Liani. The children continued to reside with their caregivers and weekly visits with mother, who had moved out of Danny's home and completed a 12-week parenting program, nine months of a substance abuse program, and was participating in aftercare. Mother was in substantial compliance with her case plan, however she missed several drug tests.

In June 2020, Jayden reported he was afraid to return home with mother because he believed Danny would be there. Jayden expressed a desire to be with his family, including his siblings, mother, and grandmother. In December 2020, when asked what he wanted, Jayden responded he wanted mother but not Danny.

In a last minute information for the court dated July 15, 2020, it was reported that during one visit with Prince mother took him to a paternal relative's home where Danny had been staying. Mother admitted that Danny lived at the home, but she did not think he would be there that day. Jayden's caregiver reported that Danny accompanied mother when mother picked up Jayden for her unmonitored visits despite being ordered to visit separately. Danny told the caregiver the paternal grandmother wanted to see Jayden and the family was having a celebration for Danny's nieces and nephews. The social worker noted that although mother appeared to have put a great deal of

10

effort into participating in her required programs, it seemed mother continued to have a relationship with Danny despite his unresolved substance abuse and domestic violence issues.

According to an interim review report dated October 5, 2020, mother tested positive for methamphetamine on September 14 and 25, 2020, although she claimed she had not used the drug since February of the previous year. A maternal uncle advised that mother was still living with Danny and was being abused. Mother denied a relationship with Danny and denied any recent abuse. Due to COVID-19, mother had been visiting the children virtually, as the caregivers were not allowing in-person visits. The visits lasted 15-20 minutes. Mother had five virtual visits with the children in August 2020 and six virtual visits with the children in September 2020. On October 1, 2020, mother told DCFS she had not visited Jayden and Brianna that week because she was focusing on her younger children.

Mother tested positive for methamphetamine twice in October 2020 and acknowledged she had relapsed.

In January 2021, DCFS reported that Jayden's therapist advised Jayden was "very adamant" about not wanting mother involved in his treatment and did not want his therapy team to speak with mother. Jayden would become "emotionally dysregulated at the mention" of mother.

On January 20, 2021, at DCFS's request, the court ordered no unmonitored visits with Liani for mother until she had proof of enrollment in substance abuse treatment.

In February 2021, DCFS reported in-person visits had resumed between mother and the children. The children were initially shy with mother but eventually played games with her

and were happy and smiling. Both Jayden and Brianna reported being happy to be visiting with mother and wanted to continue. In March 2021, DCFS reported mother was having unmonitored visits with the children. Overall the visits were reported to be positive. In June, mother had overnight visits with the children in maternal grandmother's home, as mother lived in a sober living residence where the children were not allowed.

A 12-month review hearing as to Liani took place on April 29, 2021. The juvenile court found Danny had not made substantial progress towards reunification and ordered his services terminated, but ordered DCFS to continue to provide reunification services to mother. On the same date, at the 18-month review hearing as to Prince, the court found Danny had not made substantial progress towards reunification and ordered his services terminated but continued the 18-month review for mother to June 17, 2021.

On June 16, 2021, DCFS reported that a couple of days earlier, Jayden and Brianna disclosed that Danny and mother's friends were present during an overnight/weekend visit and that Danny had spent the night both nights. Jayden did not want to disclose that Danny was present because he did not want to get in trouble with mother. Jayden noted this was not the first time Danny was present. Mother initially denied Danny was present at any visits or that she had allowed any contact between him and the children. However, after DCFS located photos of mother and Danny together on social media, mother told DCFS that she wanted to be honest and acknowledged she had allowed Danny to be present at visits and that she continued to see him.

In June and July 2021, Danny tested positive for methamphetamine, amphetamine, and marijuana three times, and had three no-shows for drug testing.

At an 18-month review hearing on July 21, 2021, the juvenile court found mother had made substantial progress in her case plan and returning the children to mother's custody would not be detrimental to their well-being. The court ordered family maintenance services and specified that Danny was not allowed to visit with the children. However, on August 3, 2021, DCFS filed an ex parte application and order noting Danny had been observed staying overnight at mother's home. Brianna was afraid of Danny and did not feel safe with him. Jayden confirmed that Danny had been present and that Brianna was afraid of him. Danny came to the home and took Jayden and his sibling to the beach, then back to the home. Jayden reported that Danny slept in the car the first two nights, but then started sleeping in the apartment.

DCFS asked the court to vacate the order returning the children to mother's care, that family maintenance services be terminated, and a section 366.26 hearing be set to select and implement a permanent plan for the children. On August 4, 2021, the juvenile court terminated mother's family maintenance services, set a section 366.26 hearing, and granted mother monitored visits on condition that Danny not be present during the visits. The court also ordered a bonding study to assess the bond between mother and the children.

**Section 366.26 report and bonding study—Jayden and Brianna**

DCFS reported mother had been visiting with the children on weekends at parks or malls for approximately three hours

each visit.  Mother would arrive on time and bring soda, candy, and the children's favorite foods.  Although the visits were positive overall, mother had a tendency to talk about the dependency case with the children and attempt to move them away from the caregiver's supervision.  The caregiver reported that the children said mother would talk about Danny and say that Danny loved them.

On November 9, 2021, Jayden and mother had a conversation in which Jayden reminded mother that she said she would not leave Danny, and accused mother of preferring Danny over him.  Mother told Jayden that everything he said would affect the case and make it less likely that he and Brianna would return to her.  The caregiver also noted that Brianna said mother had instructed her to say that she wanted to return to mother.

DCFS reported it was likely that Jayden and Brianna would be adopted by their current caregivers if parental rights were terminated.  The caregivers were providing the children excellent care, addressing all of their needs, considered them part of their family, and were committed to adoption.

Mother and the children underwent a bonding study on November 15, 2021.  The study consisted of an evaluator conducting separate interviews with mother and the children and observing interaction between mother and the children.  During her interview, mother minimized the children's fear of Danny, claimed she was no longer seeing him, said he was not as bad as the children made him seem, and stated that if she had to choose between Danny and the children, she would choose the children. The evaluator found it concerning that mother minimized the fear that Danny had instilled in the children.  The evaluator was also concerned because when asked about Danny being present

with the children, mother alternated between showing remorse and insisting that Jayden had asked for him to be present.

When Jayden was interviewed, he said he would like to live with mother but not Danny because he did "bad stuff to us." Jayden said he was afraid of Danny, but when he told that to mother she said, "I'm not giving him up." When asked if he would like to attend family therapy with mother, Jayden said no but was unable to articulate a reason. He expressed that he enjoyed living with his current caretakers, enjoyed playing sports with his foster siblings, enjoyed school, and had many friends at school. The evaluator concluded that Jayden had mixed emotions about mother and appeared hesitant about reunifying with her.

Brianna told the evaluator she disliked Danny because he was mean to them and always yelled at her brother. When asked if she missed mother, Brianna replied, "not really." She stated she missed and wanted to live with her current caretaker. Brianna drew a heart and said she loved her current caregiver. The evaluator concluded Brianna's bond with mother seemed to have been damaged, as Brianna exhibited mistrust and a lack of confidence in mother's ability to care for her.

During the observation portion of the study, the evaluator noted that both children appropriately approached mother and waited to be hugged, but Brianna quickly disengaged, and Jayden asked for mother's phone. The children appeared comfortable with mother, and mother was nurturing towards them and actively engaged with them. Brianna appeared to have developed an "avoidant-insecure" attachment with mother, as she exhibited poor self-regulation and did not respond to mother's attempts to soothe her. Jayden appeared to enjoy his time with mother, but at the end of the session both children seemed ready

and willing to leave with the caregiver. Both children expressed being happy and comfortable with their current living situation.

The evaluator concluded that there was a "potential for the development of a strong bond between [mother] and the children." However, mother's "lack of insight in regards to [Danny's] negative impact on the children remains a concern."

Overall, the evaluator felt that Brianna had an insecure attachment to mother, which could be helped with effective treatment involving a combination of family therapy and parenting education designed to ensure she had a safe living environment. The evaluator concluded that adoption by the caregivers was likely in Brianna's best interest as she had developed a healthy attachment to the foster mother. As to Jayden, the evaluator concluded "there is hope that ongoing interventions can salvage the mother and son relationship." Jayden often verbalized wanting to return to mother but was in fear of Danny. The evaluator noted that Jayden wanted to remain connected to mother and that severing his connection with her could be detrimental to his mental health. In the event he is adopted, the evaluator concluded that Jayden should participate in conjoint therapy with mother and continue supervised visits.

After the bonding study, Brianna informed the caregiver that mother had instructed her to say she wanted to "go with mother."

In a last minute information for the court, DCFS reported that on November 28, 2021, mother told the caregiver she was going to talk about the case with the children despite knowing it was not allowed. Mother was angry, threw pages from one of DCFS's reports, told Jayden to look at the pages, and said

16

everything written on the pages were lies. When the caregiver attempted to intervene, mother continued talking, blaming the caregiver and Jayden. Mother asked Jayden if some information in the report was true, and Jayden denied making the referenced statement. The caregiver was unable to determine what statement mother was referencing. Tension was high during the visit. DCFS expressed concern that mother was trying to influence Jayden.

On December 2, 2021, Jayden told the caregiver he wanted to live with mother. He said that if Danny was there, he knew how to defend himself and would call the police and tell DCFS that he wanted to return to the caregiver.

When a DCFS social worker asked Jayden about the November 28, 2021 visit with mother, Jayden responded that mother was mad, made him read the report and stated that "everything were lies [*sic*]." Jayden was sad because mother was so mad.

Jayden then asked the social worker what adoption meant. After an explanation was given, Jayden expressed a desire to be adopted by the caregiver, but requested continued visits with mother. Jayden was told that the caregiver had agreed to facilitate visits at the children's request. Jayden noted that at a recent visit mother told him she was not going to leave Danny, which made him feel scared. When Jayden asked mother who she loved more, him or Danny, mother responded "you."

On December 8, 2021, the court acknowledged it had received a death certificate for Brianna's father. According to a report issued the same date, mother had fewer visits with the children due to her job schedule but visited at least once a week. Mother also cancelled some visits stating she had the COVID-19

17

vaccine and was not feeling well or that it was too cold outside for the children.

In a January 13, 2022 status review report, DCFS reported that Jayden and Brianna continued to thrive in the home of their caregivers, who were committed to adopting them. In addition to visiting the children at a park or mall every weekend for about three hours each visit, mother also called the children Mondays, Wednesdays, and Fridays for about five minutes, and most conversations were positive.

**Mother's November 2021 section 388 petition**

On November 29, 2021, mother filed a request to change court order pursuant to section 388, alleging mother had completed her case plan, ended her relationship with Danny, and consistently visited the children. The petition requested the court return the children to mother's custody or reinstate family reunification services and grant unmonitored visits.

On December 3, 2021, the juvenile court denied the section 388 petition without a hearing, finding the request did not state new evidence or a change of circumstances, and that it was not in the children's best interest to grant the request. Mother did not appeal.

**Mother's January 2022 section 388 petition**

On January 31, 2022, mother filed a second request to change court order pursuant to section 388. The petition alleged mother had completed her court ordered case plan, continued to maintain her sobriety through programs, terminated her relationship with Danny, continued to address codependency in individual counseling, was currently employed, and visited the children consistently. Mother asked for the children to be returned to her care or, in the alternative, the court to reinstate

reunification services and grant her unmonitored visits with the children. Attached to mother's petition were certificates of completion from a domestic violence program and a substance abuse program; a letter attesting to mother's participation in mental health treatment services, and letters from mother's sponsor and therapist, among others.

On February 17, 2022, the juvenile court denied mother's section 388 petition without a hearing, finding the request did not state new evidence or a change of circumstances, and that it was not in the children's best interests to grant the request.

Mother filed a timely notice of appeal from the order denying her petition on March 15, 2022.

**Mother's April 2022 section 388 petition**

On April 1, 2022, mother filed a third request to change court order pursuant to section 388. This petition alleged mother had addressed all the issues that brought the children before the court, completed parenting classes, a domestic violence program, a substance abuse program, and a codependency program. Mother was regularly attending individual counseling, engaged in a 12-step program and was consistently visiting the children. Mother argued it would be in the best interests of the children to be returned to her care. The petition requested the children be returned to her care or, in the alternative, family reunification services be reinstated and mother's visits be unmonitored, with overnight visits. Attached to the petition were letters attesting to mother's participation in mental health treatment and drug rehabilitation services, among others. Mother also attached negative drug tests dated January 6, 14, and 21, 2022; February 15 and 25, 2022; and March 4 and 18, 2022.

On April 8, 2022, the juvenile court denied the section 388 petition without a hearing. The court found the request did not state new evidence or a change of circumstances, and that it was not in the children's best interests to grant the request.

Mother filed a timely notice of appeal from the denial of the section 388 petition on April 19, 2022.

**Final reports**

DCFS filed a report on April 4, 2022. Despite reunification services having been terminated, DCFS continued to provide mother with services. Of mother's last five drug tests, three were negative, and she failed to appear for two. Mother continued to visit appropriately with the children and called them Mondays, Wednesdays, and Fridays for five to 15 minutes. Mother visited the children on January 19, 2022, February 6, 13, and 27, 2022, and March 13 and 27, 2022. Mother could not visit the children due to a conflicting work schedule on January 16 and 23, 2022, February 20, 2022, and March 6, 2022. Mother claimed she had not been in a relationship with Danny since October 2021.

Mother provided a March 17, 2022 letter from a professional Biblical counselor stating that mother was working towards establishing and integrating life skills. Mother also provided two letters from Tarzana Treatment Centers. The first, dated March 16, 2022, reported that mother had remained compliant with mental health treatment services since August 10, 2021. The second, dated March 30, 2022, stated mother had enrolled in recovery support services on August 3, 2021, and although the program was normally six to eight months, mother's discharge date had yet to be determined. Mother tested negative for drugs on December 13, 20, and 30,

2021, January 6 and 14, 2022, February 15, 2022, and March 4 and 18, 2022.

DCFS recommended that mother's parental rights be terminated and the children be freed for adoption.

**Section 366.26 hearing—Jayden and Brianna**

At the April 25, 2022 section 366.26 hearing concerning Jayden and Brianna, mother's counsel requested a contested hearing on the issue of the beneficial parental relationship exception to termination of parental rights. The juvenile court asked for an offer of proof. Mother's counsel argued DCFS's report showed a "regular and consistent visitation schedule beyond just superficial friendly visitation" as well as "regular phone calls." Counsel also argued the bonding study showed a "substantial parent-child bond," and mother wanted to present evidence on this issue. Specifically, mother wanted Jayden to be made available for testimony. DCFS objected to mother's request for a contested hearing, arguing mother's visits were not as regular as she made them out to be and her phone calls were brief. DCFS also argued there were major parts of the bonding study that mother's counsel "glossed over," pointing out the study concluded that Jayden had "mixed emotions" concerning mother, and Brianna had an "avoidant insecure attachment" to mother due to having been traumatized and separated from mother. The children's counsel agreed with DCFS and objected to the matter being set for contest.

The juvenile court stated it had read in detail and highlighted portions of the bonding study referenced by the parties. It noted Jayden had expressed fear of Danny, and mother responded, "I'm not giving him up." In addition, Jayden appeared hesitant about reunifying with mother and expressed

21

mixed emotions regarding their relationship.  As to Brianna, her bond with mother had been damaged, and she had expressed a lack of confidence in mother's ability to care for her.  Based on the report, and the recent sporadic visitation, the court did not believe that mother's offer of proof was sufficient to meet her burden.  The court denied mother's request for a contested hearing.

After denying mother's request for a contested hearing, the court found the children were adoptable, that mother had not maintained regular visitation or contact and had not established a bond with the children sufficient to satisfy the beneficial parental relationship exception.  The court found that any benefit accruing from the children's relationship with mother was outweighed by the benefit they would receive from adoption, and that no exception to the termination of parental rights applied. The court terminated parental rights and ordered adoption as the permanent plan.

On May 4, 2022, mother filed a timely notice of appeal from the order terminating her parental rights to Jayden and Brianna. **Section 366.26 reports and hearing—Prince and Liani**

According to a last minute information for the court dated July 29, 2022, mother continued to visit the children at least weekly, and the visits went well.[6]  In a report dated September 6,

---

[6]     In June and July 2022, Danny filed petitions for modification seeking the return of Prince and Liani to his custody or reinstatement of reunification services.  The petitions were summarily denied on July 5 and 7, respectively.  On July 15, 2022, mother once again filed petitions for modification seeking return of Prince and Liani to her custody or additional

22

2022, DCFS noted mother was only available for visits on specific days due to her job schedule.  At a visit in August 2022, Liani did not want to go with mother.  The caregiver encouraged Liani to go with mother, but the child continued to return to the caregiver.  At another visit later that same month, mother would not put Liani down when Liani asked to be put down.  During this period Liani was not sleeping well, waking up in the night calling for the caregiver, asking for a bottle at 3:00 a.m., and wanting to keep the light on all night.  During a recent visit, Liani did not want mother to hold her at all and would go to the caregiver instead of mother.  The children appeared to see mother as a friend.  One visit between mother and the children ended after 30 minutes.  Liani posed for a few pictures with mother during the visit but refused to pose for the last picture.  The children were attached to their caregiver and became distressed when she left the room.

The section 366.26 hearing as to Prince and Liani commenced on September 7, 2022.  Mother, Danny, and the caregiver testified.  Counsel for mother argued the section 366.26, subdivision (c)(1)(B)(i) exception for a beneficial parental relationship applied.  Counsel argued that mother had maintained regular visitation and that the children had an emotional bond to mother, which would be detrimental to sever.

The juvenile court found by clear and convincing evidence that the children were adoptable and that mother had maintained regular visitation with the children, but had not established a bond with the children as required by section

---

reunification services.  These petitions were summarily denied on July 15, 2022.

366.26, subdivision (c)(1)(B)(i). The court found no exceptions to adoption applied and terminated parental rights.

Mother filed a notice of appeal from the order terminating her parental rights to Prince and Liani on September 15, 2022.

## DISCUSSION

### I. Section 388 petitions

Mother argues that the juvenile court erred in declining to grant her a hearing on two of her petitions filed pursuant to section 388—those filed in January 2022 and in April 2022.

#### A. *Applicable law and standard of review*

Section 388 provides that a parent may petition the juvenile court for modification of any previous order based upon changed circumstances or new evidence. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478 (*Alayah J.*).) "To obtain the requested modification, the parent must demonstrate both a change of circumstance or new evidence, and that the proposed change is in the best interests of the child." (*Ibid.*) The burden of proof is on the moving party to show by a preponderance of the evidence there is new evidence or that there are changed circumstances that make the requested change in the best interest of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"Section 388 provides an "'escape mechanism'" for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated." (*Alayah J., supra*, 9 Cal.App.5th at p. 478.) "After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.] Section 388 allows a parent to rebut that presumption by demonstrating

24

changed circumstances that would warrant modification of a prior court order." (*Ibid.*)

"To obtain an evidentiary hearing on a section 388 petition, a parent must make a prima facie showing that circumstances have changed since the prior court order, and that the proposed change will be in the best interests of the child. [Citations.] To make a prima facie showing under section 388, the allegations of the petition must be specific regarding the evidence to be presented and must not be conclusory. [Citation.] A section 388 petition must be liberally construed in favor of granting a hearing to consider the parent's request." (*Alayah J., supra*, 9 Cal.App.5th at p. 478.) "A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) "'"Thus, if the petition presents any evidence that a hearing would promote the best interests of the child, the court will order the hearing."'" (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.)

A juvenile court's summary denial of a section 388 petition is reviewed for abuse of discretion. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079.)

**B.** ***The juvenile court did not abuse its discretion in summarily denying mother's petitions***

**1.** *Effect of prior unappealed summary denial*

Mother's section 388 petitions filed in January 2022 and April 2022 alleged that she completed her court-ordered case plan, continued to maintain her sobriety through programs, was currently employed, and visited the children regularly. They also alleged she had terminated her relationship with Danny, and continued to address codependency in individual counseling.

25

Mother sought modification of the juvenile court's August 4, 2021 order terminating reunification services and setting a section 366.26 hearing. She asked for the children to be returned to her care or, in the alternative, reinstatement of reunification services. The juvenile court denied both petitions without a hearing.

Mother does not dispute she previously filed section 388 petitions in November 2021, seeking modification of the same August 4, 2021 order terminating reunification services and setting a section 366.26 hearing.[7]  The earlier petitions made largely identical allegations regarding mother's purported changed circumstances and sought identical relief. They also asserted that returning the children to mother's custody or granting additional reunification services would be in the children's best interests. The juvenile court summarily denied the November 2021 petitions, finding mother did not make a prima facie showing of new evidence or a change of circumstances or that granting the petitions would be in the children's best interests. Mother did not appeal from the summary denial of the November 2021 petitions.

DCFS contends that because the January 2022 and April 2022 petitions contained the same alleged new evidence or change of circumstances that were alleged in the summarily denied November 2021 petition, mother cannot argue the summary denial of the two petitions at issue were arbitrary, capricious or patently absurd. In other words, since mother failed to challenge the juvenile court's ruling in her November

---

[7]     Mother filed substantially similar petitions as to each of her children.

26

2021 petition, and the later petitions were largely redundant, mother cannot now contest the propriety of the later summary denials.

Mother admits the gist of the allegations in the petitions were similar, but claims that the motions were not identical. She points out that attached to the January 2022 petition were several documents that were not attached to the November 2021 petition, including: a letter from Tarzana Treatment Centers dated January 18, 2022, attesting to mother's compliance with mental health services; telephone logs attesting to mother's telephone contact with the children between September 2021 and January 2022; records of mother's visitation with the children between August 2021 and January 2022; an e-mail dated October 15, 2022 from mother's employer, confirming her employment; and various letters from family members attesting to mother's changes. However, none of these additions showed genuinely changed circumstances from the November 2021 petition. At the time of the November 2021 petition, mother had completed a domestic violence program, completed a substance abuse program and enrolled in recovery services, was complying with mental health services, completed a codependency program, and was visiting fairly consistently with the children. Thus, her circumstances had not changed significantly in the previous three months. In addition, mother offered no new evidence suggesting that a change of order would be in the best interests of her children, which was a required element of her petition.

As to the April 2022 petition, mother points out that there were also several documents attached to this petition that were not attached to her November 2021 petition, including: a letter from Tarzana Treatment Centers dated March 16, 2022,

attesting to mother's compliance with mental health treatment services; a letter from Tarzana Treatment Centers dated March 30, 2022, attesting to mother's enrollment in Long Beach recovery support services; a letter attesting to her progress in that program; a letter from a Biblical counselor attesting to mother's progress in trauma and codependency issues; and numerous negative drug test results.  Again, these documents do not serve to show a change of circumstances from her November 2021 petition.  Mother had already completed a drug treatment program and was in a recovery program.  Further, as with her January 2022 petition, the new documents presented no evidence that a change in the previous order would be in the best interests of the children.

DCFS is correct that the January 2022 and April 2022 petitions were substantially similar to the unappealed November 2021 petition.  However, DCFS has failed to cite legal authority suggesting that mother's failure to appeal the November 2021 summary denial precludes her from appealing the later summary denials.  Therefore, despite mother's failure to challenge the court's summary decision on her November 2021 petition, we address mother's argument that the court's similar decisions on the January 2022 and April 2022 petitions constituted abuses of the court's discretion.

> **2.** *Mother failed to set forth a prima facie case for granting her petitions*

A review of the January 2022 and April 2022 petitions on their merits shows the juvenile court did not abuse its discretion in summarily denying the petitions.  Mother's burden was to make a prima facie case that there had been a genuine change of circumstances since the time of the order she was contesting.  In

28

addition, mother bore the burden of showing her proposed change of order would be in the best interests of the children. (*Alayah, supra*, 9 Cal.App.5th at p. 478.) "The statutory language 'makes clear that the hearing is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order.'" (*In re Justice P.* (2004) 123 Cal.App.4th 181, 191.)

Mother's petitions failed to set forth a prima facie case as required. While mother asserted she had completed her court-ordered programs and terminated her relationship with Danny, she failed provide any evidence that the proposed change of order would promote the best interests of the children. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1507 [finding that § 388 petition was properly denied "because there was no showing that it was in the minors' best interests for the court to return them to appellant's custody"].) In her January 2022 petitions, in response to the question, "Why would the requested order or action be better for the child or youth?," mother responded by merely highlighting the actions she had taken, stating the change of order would be in the best interest of her children . . . given her continued growth." In her April 2022 petitions, mother's response was equally conclusory, stating it would be in the children's best interest to be returned to her so she could provide them with "love, care, and familial support." These conclusory statements were insufficient to require a hearing on mother's petitions.[8] (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1349 [finding that "merely conclusory" allegation regarding the child's

---

[8]    In her declaration filed in support of her January 2021 and April 2021 petitions, mother merely declared, "I believe it is in the best interest of my children to return to my care," without any specificity or further elaboration.

29

best interest did not require a hearing to determine if the child would benefit from a change of order]; see *In re Justice P., supra*, 123 Cal.App.4th at p. 192 [noting that "[t]he presumption favoring natural parents by itself does not satisfy the best interests prong of section 388"].)

Mother's petitions failed to address how her proposed changes of order would benefit any of her four children. Mother was required to reference "facts" that would "sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." (*In re Edward H., supra*, 43 Cal.App.4th at p. 593.) Mother cited no such facts, providing only her conclusory opinion.[9] Because mother failed to set forth a prima facie case that her proposed changes would be in the best interests of the children, the juvenile court did not abuse its discretion in summarily denying the petitions.

## II. Termination of parental rights—Jayden and Brianna

Regarding the termination of mother's parental rights to Jayden and Brianna, mother contends she made a sufficient offer of proof requesting a contested section 366.26 hearing so she could present evidence to support the beneficial parental relationship exception to termination of parental rights found under section 366.26, subdivision (c)(1)(B)(i). She argues the trial court erred in denying her a contested hearing on this issue.

---

[9] *In re Jeremy W.* (1992) 3 Cal.App.4th 1407 is distinguishable. In *Jeremy W.*, the mother included in her petition "significant allegations" including "evidence Jeremy desired to be with his mother." (*Id.* at p. 1413.) Here, mother failed to allege any such evidence concerning the best interests of her children.

30

**A.** *Applicable law and standard of review*

In order to meet the beneficial parental relationship exception to termination of parental rights, a parent has the burden of showing (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*In re Caden C.* (2021) 11 Cal.5th 614, 636-637 (*Caden C.*).)

A parent's due process rights are implicated in dependency proceedings, including the right to cross-examine witnesses.  (*In re Malinda S.* (1990) 51 Cal.3d 368, 382-385, superseded by statute as stated in *People v. Otto* (2001) 26 Cal.4th 200, 207.)  However, due process is a flexible concept that depends upon the circumstances of the case.  (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1120 (*Tamika T.*).)  The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.  (*Ibid.*)  Thus, a juvenile court does not violate a parent's due process rights by requiring an offer of proof from the parent before setting a hearing on the beneficial parental relationship exception to termination of parental rights.  (*Id.* at p. 1121; see *In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816.)  The parent's offer of proof "must be adequate in scope and must be specific."  (*In re A.G.* (2020) 58 Cal.App.5th 973, 982 (*A.G.*).)  A legally sufficient offer of proof must set forth "'the actual evidence to be produced, not merely the facts or issues to be addressed and argued.'"  (*Ibid.*)  Due process "does not require a court to hold a contested hearing if it is not convinced the parent will present relevant

evidence on the issue he or she seeks to contest." (*In re Earl L.* (2004) 121 Cal.App.4th 1050, 1053.)

A juvenile court's denial of a parent's request for a contested hearing following a proper demand for an offer of proof is reviewed for abuse of discretion. (*In re Grace P.* (2017) 8 Cal.App.5th 605, 611 (*Grace P.*).) The test for abuse of discretion is whether the trial court exceeded the bounds of reason, which warrants a very high degree of deference to the decision of the juvenile court. (*In re J.N.* (2006) 138 Cal.App.4th 450, 459.)

Even if the trial court abused its discretion, we may not reverse an order unless the abuse of discretion was prejudicial and resulted in a miscarriage of justice. (*People v. Cahill* (1993) 5 Cal.4th 478, 502; see Cal. Const., art VI, § 13; Code Civ. Proc., § 475.)

**B.	*No abuse of discretion occurred***

Mother contends that her offer of proof was sufficient to require the court to grant her a contested hearing on the exception set forth in section 366.26, subdivision (c)(1)(B)(i). In making the offer of proof, mother argued DCFS's April 4, 2022 report documented regular and consistent visitation, which was beyond mere friendly interaction but was positive and substantial. Mother pointed out she had regular weekend visits as well as phone calls during the week.

Mother also cited the bonding study ordered by the court. Mother argued the report documented a substantial parent-child bond, for which mother wanted the opportunity to present evidence. Mother argued the bonding study showed an emotional bond between mother, Jayden and Brianna. Mother requested the opportunity to testify and asked she have the opportunity to examine Jayden.

The trial court disagreed with mother, finding her offer of proof was insufficient on both the issue of visitation and the issue of whether a sufficient bond existed. The court cited portions of the record suggesting Jayden was hesitant about reunifying with mother and showed mixed emotions towards her. The court noted Brianna's bond with mother appeared to have been damaged, and Brianna had a lack of trust in mother's ability to care for her. The court concluded "based on [the] report of the expert, as well as recent visitation, or lack thereof, I do not believe an appropriate offer of proof [had] been made . . . ."

Both mother and the court relied heavily on DCFS's reports and the bonding study, the contents of which were not contested. Because the parties were citing the same uncontested evidence, the court did not abuse its discretion in determining that mother's offer of proof would offer no new relevant evidence. As set forth in *Tamika T., supra*, 97 Cal.App.4th at page 1124, "A proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact." Mother was not contesting the contents of the reports or the bonding study and did not seek to cross-examine the authors of those documents. Instead, like the court, she relied on them.

Thus, the only portion of mother's offer of proof that had not already been addressed in either DCFS's reports or the bonding study was the proposed testimony of Jayden. However, mother did not specify what testimony she believed that Jayden would provide. The court had before it years of interviews with Jayden regarding his relationship with mother. Mother did not propose that Jayden would say anything different from what he had already said. Mother did not suggest Jayden's testimony

33

would be new or reveal something to shed new light on the nature of their relationship.

Mother was required to show regular, consistent visitation, that the children had a "substantial, positive, emotional attachment" to her and that "terminating that attachment would be detrimental" to the children "even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) As the juvenile court noted, when Jayden told mother that he was afraid of Danny, mother replied, "I'm not giving him up." The court also noted the bonding study showed Jayden had mixed emotions about mother and was hesitant to reunify with her. Brianna also expressed fear of Danny, and when asked if she missed mother, responded, "not really." However, she said she missed and wanted to live with her current caregiver. The evaluator concluded there was a potential that a strong bond could develop between mother and the children, but mother was in need of further treatment.

Mother does not suggest that these comments and conclusions were inaccurate. Nor does she suggest that the reports regarding visitation were inaccurate or incomplete. She did not seek to cross-examine the evaluator to undermine the conclusions of the bonding study. Instead, she sought to elicit additional unspecified testimony from Jayden. Under the circumstances, the juvenile court did not abuse its discretion in concluding that such testimony would be redundant and would not assist mother in attempting to prove the beneficial parental relationship exception.

C. *The relevant case law*

Mother relies on *Grace P., supra*, 8 Cal.App.5th 605 and *A.G., supra*, 58 Cal.App.5th 973 as support for her position the

34

juvenile court abused its discretion in denying her a contested hearing on the beneficial parental relationship exception to termination of parental rights.  We disagree that these cases compel a result in mother's favor in this case.

In *Grace P.*, the appellate court determined the juvenile court erred in denying a father a contested hearing on the beneficial parental relationship exception to termination of parental rights.  (*Grace P., supra*, 8 Cal.App.5th at p. 613.)  The court found the father's offer of proof "was undisputedly sufficient."  (*Ibid.*)  First, the father's offer of proof addressed the consistency of his weekly visitation.  The court noted DCFS's reports supported a conclusion that the father maintained regular visitation.  (*Ibid.*)[10]  Further, the father proposed to present testimony regarding the "quality of his visitation," including how he parented all three of his children during visitation and how they regarded him as a father figure.  (*Grace P.*, at p. 614.)  In sum, the father's offer of proof "indicated that Father and Grace would expound on the details of the relationship that ha[d] been . . . documented by DCFS."  (*Id.* at

10    In *Grace P.*, the juvenile court agreed the father had engaged in sufficiently regular visitation.  (*Grace P., supra*, 8 Cal.App.5th at p. 613.)  Here, in contrast, the juvenile court noted mother's visitation was not consistent.  Mother argues her visitation was inconsistent only recently, and that it was inconsistent in part due to precautions surrounding the parties' exposures to COVID-19.  It was within the juvenile court's authority to consider mother's recent visitation schedule and to reach its own factual conclusions regarding the recent inconsistency.  For this analysis, it is significant that mother failed to provide an offer of proof suggesting she could present any new or different facts regarding her visitation.

35

p. 615.)  Significantly, unlike the present matter, there does not appear to have been a thorough bonding study done in *Grace P.*

Here, mother did not suggest specific ways in which she and Jayden could expound upon the reports and studies already in evidence.  Instead, her offer of proof cited to DCFS's reports and the bonding study in support of her request for a contested hearing.  These were documents already in the court record, and mother offered nothing to contradict them or expand upon them.  As the juvenile court had read and considered the DCFS reports and the bonding study, it did not abuse its discretion in determining that mother had failed to show that her proposed testimony would be novel or helpful.

Mother also relies on *A.G., supra*, 58 Cal.App.5th 973, in which the appellate court reversed and remanded a case to the juvenile court to further consider the legal sufficiency of a mother's offer of proof.  (*Id.* at p. 983.)  The mother had submitted a written offer of proof concerning both the beneficial parental relationship and the sibling relationship exceptions to adoption.  In her written offer of proof, the mother identified nine witnesses who would be able to testify concerning both exceptions.  (*Id.* at pp. 989-990.)  The Monterey County Department of Social and Employment Services objected, stating mother only identified vague statements that the witnesses would make.  (*Id.* at pp. 990-991.)  The juvenile court agreed, finding the mother's offer of proof provided only "'categories of information'" without specific articulable facts.  (*Id.* at p. 991.)  The *A.G.* court disagreed, finding "[t]he offer of proof here identified nine potential witnesses and did more than simply recite facts."  (*Id.* at p. 1012.)  While the court noted the mother's offer of proof had some deficiencies, such as the dates of certain events, the

contents of videotapes and photographs, and specifics about detriment to the child, the court noted that "if the juvenile court were to exercise its discretion to permit mother to amend her proffer, she may have been able to cure such deficiencies." (*Id.* at p. 1014.) The court reversed the challenged order for further consideration of the mother's offer of proof, noting that the court "may consider additional argument of the parties, and, in its discretion, may allow mother the opportunity to amend her offer of proof with any specific evidence she believes she can produce that is consistent with her prior oral and written offers of proof" to aid the court in determining whether the mother's offer of proof was sufficiently specific to warrant a contested hearing. (*Ibid.*)

The offer of proof at issue in *A.G.* "contained some specifics and was thus partially compliant." (*A.G., supra*, 58 Cal.App.5th at p. 1014.) It is apparent it was far more detailed than the offer at issue in this case, as it contained references to specific events, photographs and videos. In contrast, the offer of proof made here was vague about what information would be provided by mother's and Jayden's testimony. Unlike the offer of proof in *A.G.*, mother's offer of proof was not partially compliant.

The *A.G.* court found a juvenile court must "'*take caution* before denying a contested hearing' on the parental relationship exception." (*A.G., supra*, 58 Cal.App.5th at p. 1009.) Noting, "[w]hen the parent has addressed regular visitation and the existence of a beneficial parent-child relationship, but there is some question about the proffer's adequacy, the juvenile court should find the parent's offer of proof legally sufficient and order a contested hearing." (*Ibid.*) The *A.G.* court concluded that a

37

juvenile court should "construe the parent's offer of proof liberally in favor of allowing such a hearing." (*Ibid.*)

Even construing mother's offer of proof liberally, it did not contain sufficiently specific descriptions of evidence that would warrant a hearing in this case. Mother failed to reference evidence that would differ from or add to the information in the reports and bonding study the court already had. Under the circumstances, the juvenile court did not abuse its discretion in denying mother a contested hearing.

## III. Termination of parental rights—Prince and Liani

At the section 366.26 hearing as to Prince and Liani, the juvenile court found the beneficial parental relationship exception to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(i) did not apply. Mother argues that, in declining to find that the exception applied, the juvenile court did not comply with the principles announced in *Caden C., supra*, 11 Cal.5th 614. Specifically, mother argues that instead of focusing on whether the children had a substantial, positive, emotional attachment to mother, the court improperly focused on comparing mother to the children's caregiver. Further, mother argues, the juvenile court improperly focused on whether the children's relationship with mother was "parental." As set forth below, we find the court correctly applied the law when it considered the beneficial parental relationship exception, therefore we affirm the court's order terminating mother's and Danny's parental rights to Prince and Liani.

### A. *Applicable law and standard of review*

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the child. (*Caden C., supra*, 11 Cal.5th at p. 630; see § 366.26, subd. (b).) A section 366.26

hearing is set when the court has determined the child may not safely be returned to the parent after "a maximum of 18 months from removal." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.)  The hearing takes place only after reunification services have been terminated, thus "the focus shifts to the needs of the child for permanency and stability." (*Id.* at p. 309.)  The permanent plan preferred by the Legislature is adoption.  (§ 366.26, subd. (b)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532.)

At the section 366.26 hearing, the juvenile court must conduct a two-part inquiry.  First, the court must determine whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time.  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re D.M.* (2012) 205 Cal.App.4th 283, 290.)  If the court determines the child is adoptable, it must terminate parental rights unless the parent opposing termination can meet the burden of proving one of the statutory exceptions to termination of parental rights.  (§ 366.26, subd. (c)(1)(A) & (B); *Caden C., supra*, 11 Cal.5th at p. 631.)

One such exception is found in section 366.26, subdivision (c)(1)(B)(i).  To establish this exception, a parent must prove by a preponderance of the evidence that (1) the parent has maintained regular visitation and contact with the child, "taking into account the extent of visitation permitted," (2) the child has a substantial positive, emotional attachment to the parent such that the child would benefit from continuing the relationship, and (3) terminating the relationship "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

In assessing whether the child would benefit from continuing the relationship, juvenile courts may consider various

39

factors, including "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C., supra*, 11 Cal.5th at p. 632.) Concerning the third element, the juvenile court must "decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Id.* at p. 633.)  In other words, the court must consider "what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)

The parent has the burden of proving each element of the beneficial parental relationship exception. (*Caden C., supra*, 11 Cal.5th at p. 636.)  The juvenile court's findings as to the first two elements—regular visitation and whether the child would benefit from continuing the relationship—are reviewed for substantial evidence. (*Id.* at pp. 639-640.)  As to the third element, the juvenile court's factual findings are reviewed for substantial evidence, but the court's weighing of the relative harms and benefits of terminating parental rights is reviewed for abuse of discretion. (*Id.* at p. 640.)  However, where the juvenile court has determined that the exception does not apply, a parent's challenge "amounts to a contention that the 'undisputed facts lead to only one conclusion.'" (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  In other words, "[u]nless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*Ibid.*)  The question of whether a juvenile court applied the correct legal standard in a given case is a question of law requiring de novo review. (*In re S.G.* (2021) 71 Cal.App.5th 654, 673.)

**B.** *The juvenile court did not apply improper criteria*

Mother argues that in rendering its decision on the applicability of the beneficial parental relationship exception to termination of parental rights, the court applied improper criteria under *Caden C.* Specifically, mother argues the juvenile court improperly compared her with the children's caregiver and improperly considered whether mother played a parental role in the children's lives. We disagree and find the juvenile court considered only relevant, permitted factors in rendering its decision on this issue.

Mother first takes issue with the juvenile court's discussion of the children's relationship with their caregiver. The court noted the children had been with the current caregiver since September 2020 and that "she is the only day-to-day mother caregiving figure that these children have had." The court continued to explain that mother provided "amusement" to the children, but there did not appear to be "a really strong and ongoing attachment between Prince and Liani and . . . their biological mother." The court noted "[t]he children do seem to have a friendly relationship with mother, but it is not the type of bond that the court would expect to see at this point in time." The court noted mother had never "participated in any of the children's mental or physical health needs." In discussing whether severing the bond would be detrimental, the court noted that losing their mother was "more than made up by the fact that they have been in a long-term steady placement now for nearly two years with, albeit, a woman a bit older, but she seems to be genuinely concerned, involved in the interaction with the children for the children's benefit."

41

Mother points out that the *Caden C.* court cautioned that the court may not compare the parent's attributes as custodial caregiver relative to those of the potential adoptive parent. (*Caden C., supra*, 11 Cal.5th at p. 634 [noting that "the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver"].) Mother argues she was not required to prove that the children's attachment to her was their primary bond. She points out that a parent does "not have to compete with the foster mother as to who would provide the minor with more appropriate care." (*In re M.G.* (2022) 80 Cal.App.5th 836, 851.) Mother cites several cases that articulate the same legal principle. (*In re D.P.* (2022) 76 Cal.App.5th 153, 168; *In re J.D.* (2021) 70 Cal.App.5th 833, 859 (*J.D.*); *In re S.B.* (2008) 164 Cal.App.4th 289, 299-300; *In re Scott B.* (2010) 188 Cal.App.4th 452, 472; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-690.)

We find the juvenile court's statements did not improperly compare mother to the caregiver. Instead, the context of the statements makes clear the court was properly weighing whether terminating the parental relationship "would be detrimental to the child . . . when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) The court was not required to refrain from mentioning the caregiver at all, or decline to state the reality of the circumstances. As noted in *Caden C.*, it "is a crucial aspect of the trial court's responsibility" to "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at pp. 631-632.) The comments mother points out do not compare her to the caregiver, but appropriately consider the benefits the

children would receive from being adopted by their long-term caregiver.

Mother next argues the court improperly focused on whether mother's relationship with the children was "parental." Mother argues the *Caden C.* court did not require that a parent must occupy a parental role in a child's life in order for the beneficial parental relationship exception to apply. (*Caden C., supra*, 11 Cal.5th at pp. 631-632.) Instead, the *Caden C.* court noted that the law "'does not narrowly define or specifically identify the type of relationship necessary to establish the exception.'" (*Id.* at pp. 632-633, quoting *In re S.B., supra*, 164 Cal.App.4th at p. 299.) According to *Caden C.*, the parent must show "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Id.* at p. 636.) Thus, mother argues, whether or not mother provided day-to-day care for the children, as opposed to being a "friendly visitor," was not a proper consideration for the juvenile court to undertake.

While mother correctly articulates the law regarding the beneficial parental relationship exception, she fails to point to any language suggesting the juvenile court expected mother to play a parental role in the children's lives. The juvenile court pointed out the caregiver was "the only day-to-day mother caregiving figure that these children have had." This factual statement was relevant to the juvenile court's analysis regarding the benefits of adoption and in no way compared mother and the caregiver. The court also pointed out, "[t]he children do seem to have a friendly relationship with mother, but it's not the type of bond that the court would expect to see at this point in time."

43

Again, while the court noted that mother did not have a strong bond with the children, the court did not impose any requirement that the relationship be parental. Finally, mother takes issue with the juvenile court's statement that mother is "more of a playmate" to the children and that she had not "ever participated in any of the children's mental or physical health needs." There was nothing erroneous in the court's discussion of these subjects during its weighing of the factors to be considered concerning the beneficial parental relationship exception. The statements do not support mother's contention the court improperly imposed on mother a requirement that she occupy a "parental role" in the children's lives.

Instead, the comments show the court was properly considering numerous factors, including "'[t]he age of the child[ren], the portion of the child[ren]'s li[ves] spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child[ren], and the child[ren]'s particular needs.'" (*Caden C., supra*, 11 Cal.5th at p. 632.) As the *Caden C.* court noted, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid.*) It was not error for the juvenile court to do so here.

The cases cited by mother are distinguishable. In *J.D., supra*, 70 Cal.App.5th 833, when discussing the beneficial parental relationship exception to termination of parental rights, the agency stressed that the child stated he wanted to be the caregiver's son. The *J.D.* court pointed out that "mother was not required to prove that J.D.'s attachment to her was his primary bond." (*Id.* at p. 859.) The *J.D.* court ultimately reversed the termination of parental rights because there was insufficient information in the record as to the nature of the mother's

44

relationship with the child. (*Id.* at pp. 860-864.) In addition, the juvenile court's finding included a conclusory and problematic statement that the mother's relationship with J.D. "did not 'amount to a parental bond.'" (*Id.* at p. 864; see *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229 [order terminating parental rights reversed in part due to the juvenile court's repeated reference to whether parents occupied a "'parental role'" or had a "'parental relationship'" with the children].) Thus, the *J.D.* court could not "be certain the juvenile court did not rely on improper factors in assessing" mother's relationship with her son. (*J.D., supra*, at p. 863.) Here, in contrast, there is no indication the juvenile court was mandating a parental bond or considering improper factors.

Similarly, *In re D.M.* (2021) 71 Cal.App.5th 261, 264, involved a termination of parental rights where the juvenile court did not have the benefit of the *Caden C.* opinion at the time it made its decision on the beneficial parental relationship exception to termination of parental rights. (*Id.* at p. 264.) The juvenile court had been focused on whether the father played a parental role in the children's lives and "said nothing about the attachment between father and his children." The *D.M.* court found the juvenile court's comments demonstrated that "it considered factors which *Caden C.* has explained are inappropriate in determining whether the parental-benefit exception applies." (*D.M.*, at p. 271.) Similarly, in *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211, the court noted in denying the beneficial parental relationship exception, the juvenile court stated that "the parents 'ha[d] not acted in a parental role in a long time' and the prospective adoptive parents 'ha[d] been acting in a parental role.'" Because the *L.A.-O.* court was not certain

45

what the juvenile court meant, it remanded the matter with directions to reconsider the application of the parental-benefit exception in light of *Caden C.* (*L.A.-O.*, at pp. 211-212.)

In contrast to these cases, the court here had the benefit of the *Caden C.* opinion. In fact, in rendering its decision, the court explicitly discussed *Caden C.* in reference to the beneficial parental relationship exception. The record shows that instead of improperly focusing on whether mother occupied a parental role, the court in this case considered a variety of factors including the children's relationship to mother and how they felt about her. The court's decision on the beneficial parental relationship exception spans over 12 pages of the reporter's transcript and discusses in detail how the benefits to the children of adoption outweigh any benefit from their relationship with mother, the consideration of the ages of the children and the time spent in mother's care, the quality and strength of the bond between the children and mother, and the needs of the children for permanency.

The juvenile court's comment that "it would be detrimental for the children to be returned to either of the parents" does not change the analysis. Mother claims this comment was evidence that the juvenile court was straying from the principles set forth in *Caden C.*, which clarified that "[n]othing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child . . . ." (*Caden C., supra*, 11 Cal.5th at p. 634.) Mother argues the inability of mother to provide a home for the children could not justify the termination of parental rights. (Citing *In re Amber M., supra*, 103 Cal.App.4th at p. 690.)

46

As set forth above, the juvenile court's thorough decision showed the court fully understood the proper factors for consideration set forth in *Caden C.* The court's comment that returning the children to mother would be detrimental was not the primary focus of the court's analysis, nor did it alter the analysis. Under the circumstances, we decline to find error.[11]

The court's decision complied with *Caden C.* and is therefore affirmed.[12]

## IV.  ICWA

### A.  *Applicable law and standard of review*

ICWA and related California statutes reflect the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) An "Indian child" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

---

[11]    Because we have determined the juvenile court did not err in conducting its analysis under the beneficial parental relationship exception to termination of parental rights, we decline to address mother's argument that such error was prejudicial.

[12]    Danny also appeals from the termination of his parental rights to Prince and Liani, joining in and adopting by reference mother's argument. Because we have determined that mother's appeal fails on the merits, we decline to discuss father's appeal.

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case.  These requirements are sometimes collectively referred to as the duty of initial inquiry." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741 (*Benjamin M.*)) "The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).)  The court and child welfare department "have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child.  (§ 224.2, subd. (a).)

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).)  Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child.  (§ 224.2, subd. (c).)  In addition, the juvenile court must instruct the parties to

48

inform the court if they subsequently receive information that provides reason to know the child is an Indian child. (§ 224.2, subd. (c).)

If the "initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' ([§ 224.2,] subd. (e), italics added.) If that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

We review a juvenile court's ICWA findings under the substantial evidence test, "'which requires us to determine if reasonable, credible evidence of solid value supports' the court's ICWA finding." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022 (*Dezi C.*).)[13] Even if substantial

---

[13] The California Supreme Court granted review of *Dezi C.* on September 21, 2022, S275578. In its opinion granting review, the Supreme Court has stated that pending review, *Dezi C.* "may be cited, not only for its persuasive value, but also for the limited purpose of establishing the existence of a conflict in authority that would in turn allow trial courts to exercise discretion under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450,

evidence does not support the juvenile court's ICWA findings, we may not reverse unless we find that error was prejudicial. (Cal. Const., art. VI, § 13; *Benjamin M., supra*, 70 Cal.App.5th at p. 742.)

At this time, California appellate courts have taken varying positions on the rules for assessing whether a defective initial inquiry is harmless. The varying approaches have led to "a continuum of tests for prejudice stemming from error in following California statutes implementing ICWA." (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1011 (*A.C.*); see *Dezi C., supra*, 79 Cal.App.5th at p. 777, review granted.) Our division has adopted the following rule: "[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*In re Dezi C., supra*, at p. 779.)

B. *Error and conditional reversal*

In each of the three appeals before us, mother contends the order terminating parental rights should be conditionally affirmed so that extended family members may be asked about whether the children are Indian children. Danny makes the same contention as to the appeal concerning Prince and Liani. DCFS concedes that the record does not show any extended

---

456, to choose between the sides of any such conflict." (*In re Dezi C.* (Sept. 21, 2022, S275578).)

family members were ever asked whether the children are Indian children.  DCFS agrees that the order terminating parental rights should be conditionally affirmed and the matter remanded so that the extended family members may be asked whether the children are Indian children.

California law imposes on the juvenile court a statutory duty to ask each party at their first appearance in court about a child's Indian ancestry.  (§ 224.2, subd. (c).)  California law imposes a similar duty on child welfare agencies to ask extended family members about a child's possible Indian heritage. (§ 224.2, subd. (b).)  The failure to make such statutorily mandated inquiries is error under state law.

Mother, Alexander and Danny denied Indian heritage. However, there is no evidence contradicting mother's claim that DCFS failed to inquire of the extended family members whose respective contact information was available to DCFS whether the children may be Indian children.  Because section 224.2, subdivision (b) requires DCFS to inquire of extended family members as part of the initial inquiry under ICWA, substantial evidence is lacking to support the juvenile court's ICWA finding.

Under California law, we may not reverse unless we find the court's error under ICWA was prejudicial.  (Cal. Const., art. VI, § 13; *Benjamin M., supra*, 70 Cal.App.5th at p. 742.)  Despite the technical violation of the initial inquiry requirements under section 224.2, normally we would apply the "'reason to believe' rule" that we adopted in *Dezi C., supra*, 79 Cal.App.5th at pages 779-780, review granted, and conclude that the error was harmless.

However, in this matter DCFS agrees that because *Dezi C.* is pending before the Supreme Court, the more expedient

51

resolution for the children is to conditionally affirm and remand the matter.[14]  Although *Dezi C.* remains good law during the pendency of review (Cal. Rules of Court, rule 8.1105(e)), and we adhere to *Dezi C.* during this period, we acknowledge the parties' agreement that it is in the best interests of the children to address all ICWA issues now rather than waiting for the uncertainty regarding *Dezi C.*'s precedential status to be resolved (and *then* to resolve any noncompliance with ICWA, after months have passed).  We find it is appropriate to accept the parties' request for a remand in this matter.  In doing so, we follow the Legislature's guidelines set forth in Code of Civil Procedure section 128, subdivision (a)(8), which directs us to accept a stipulation of the parties for reversal only if we find: (1) "[t]here is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal," and (2) "[t]he

---

[14]     Although the parties request a conditional affirmance, we believe what they seek is a conditional reversal for the limited purpose of allowing DCFS to satisfy its duty of initial inquiry under ICWA and thereby to eliminate the ICWA "error" that the parties believe exists.  We recognize that the Courts of Appeal are deeply split on whether to conditionally affirm or conditionally reverse in cases where there is no stipulation (compare, e.g., *In re J.K.* (2022) 83 Cal.App.5th 498 [conditionally affirming] and *In re Rylei S.* (2022) 81 Cal.App.5th 309 [same] with, e.g., *In re D.B.* (2022) 87 Cal.App.5th 239 [conditionally reversing] and *In re E.V.* (2022) 80 Cal.App.5th 691 [same]), but conclude that the functional effect of what we are doing should control in cases where the parties are agreeing to a limited remand following an order terminating parental rights.  (*In re A.C.* (2022) 86 Cal.App.5th 130 [accepting stipulation, but issuing disposition as conditional reversal]; *In re Veronica G.* (2007) 157 Cal.App.4th 179, 187.)

52

reasons of the parties for requesting reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement." (Code Civ. Proc., § 128, subd. (a)(8).)

Under these standards, conditional reversal with a limited remand to comply with ICWA is appropriate in this case. The reasons for the remand request is a practical one: It is not clear at this time what the test is for assessing "prejudice" in cases where DCFS has not complied with its ICWA duty of initial inquiry; the error in this case would be prejudicial under some tests and not prejudicial under others; the California Supreme Court is not likely to resolve this issue for months, if not years; there is the possibility that a ruling by this court affirming the termination of parental rights (due to absence of "prejudice" from the ICWA error under the *Dezi C.* test) might be undone months, if not years, from now when the Supreme Court defines the proper test for "prejudice"; it is undisputed that, in dependency proceedings "involv[ing] the well-being of children," "considerations such as permanency and stability are of paramount importance" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute as stated in *In re M.R.* (2005) 132 Cal.App.4th 269, 273); and these considerations of permanency and stability are better served by a remand to eliminate any ICWA error *now* (and thereby to ensure that the order terminating parental rights can be final sooner rather than later) rather than rejecting remand and affirming (which leaves open the possibility that the ICWA issue—and, depending on the outcome of that issue, the entire case—will be re-opened months, if not years, down the line). Given these considerations, there is

53

"no reasonable possibility" that the interests of the nonparties (namely, the prospective adoptive parents and the Indian tribes) "will be adversely affected by the reversal" because those nonparties will benefit by the stability imparted by resolving the ICWA issue now instead of at some point in the future. And the permanency and stability imparted by a remand to resolve the ICWA issue now also "outweigh[s] the erosion of public trust" that arises from conditionally reversing the order terminating parental rights. Indeed, the remand in this case *enhances* the public trust by ensuring compliance with ICWA.

Accordingly, we find no reasonable possibility that the interests of the public or nonparties will be adversely affected by the conditional reversal and remand requested by the parties, and find that the reasons for reversal outweigh the erosion of public trust and the decreased incentive for pretrial settlement. (See Code of Civ. Proc., § 128, subd. (a)(8).) We therefore conditionally reverse the order, with directions to the juvenile court to conduct a further ICWA inquiry.

## DISPOSITION

The juvenile court's order is conditionally reversed. The matter is remanded to the juvenile court with the following directions:

1. DCFS shall make reasonable efforts to ask all known and available extended family members if the children may be Indian children.

2. DCFS shall document its efforts to interview all known and available extended family members as to whether the children are or may be Indian children and provide a report with

documentation and the results of its interviews to the juvenile court.

3. At a noticed hearing, with counsel for the parties reappointed, the juvenile court shall make a finding regarding the applicability of ICWA, determine whether DCFS has interviewed all known and available extended family members, and proceed in accordance with sections 224.2 and 224.3, including, if required, ordering DCFS to send notices with the above information to the appropriate tribes in accordance with ICWA.

4. If based on the completed inquiry, the juvenile court finds there is no reason to believe the children are Indian children, or if no tribe or agency determines the children are Indian children after notice has been provided pursuant to ICWA, the order terminating parental rights shall remain the order of the juvenile court. If notices are sent and the juvenile court receives responses from the noticed tribes, the juvenile court shall proceed in accordance with ICWA if any tribe determines either of the children is an Indian child.

 

_____

CHAVEZ, Acting P. J.

We concur:

 

_____          _____

HOFFSTADT, J.                          KWAN, J.*

---

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.